## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MICHAEL WIGGINS**                                  **CIVIL ACTION**

**VERSUS**                                           **NO. 13-6751**

**N. BURL CAIN, WARDEN**                             **SECTION "A"(5)**

### REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.   Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

### I.      *Procedural and Factual History*

Petitioner, Michael Wiggins, appearing through counsel, is a state prisoner incarcerated in the Louisiana State Penitentiary, in Angola, Louisiana.  On March 1, 2007, an Orleans Parish grand jury indicted Wiggins on one count of second degree murder

---

[1] Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, or that the claim relies on a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

pursuant to Louisiana Revised Statute 14:30.1[2]  Six days later, on March 7, 2007, Wiggins

appeared for arraignment and entered a plea of not guilty.[3]

On August 4, 2009, Wiggins proceeded to trial, where he waived his right to a jury,

opting instead for a bench trial.[4]   The following facts were established at trial and

summarized by the Louisiana Fourth Circuit Court of Appeal:

> According to the testimony of Sonya Dannel, the wife of the victim
> Baretta Dannel, Mr. Dannel was shot and killed on the night of October 21,
> 2006.   Mrs. Dannel recounted that she and her husband had been to a
> wedding reception and out to eat; as they were on their way home her
> husband pulled their truck over so that he could speak to a friend whom he
> had not seen since Hurricane Katrina.   After his friend went to move his
> vehicle, the victim remained outside his truck, urinating, while Mrs. Dannel
> rested in the cab of the truck.   After the victim finished urinating and walked
> back around the truck, he saw three men walking on the opposite side of the
> street.   The victim asked the men if they knew where he could obtain
> marijuana, but they indicated there was none available in the area.   The
> victim walked toward the men, continuing a conversation with one of them
> whom Mrs. Dannel later identified as the defendant.   Suddenly the defendant
> pulled a gun from his pocket and shot the victim.   The victim turned and tried
> to run to his truck, but the defendant shot him again.   The victim died on the
> scene.
>
> The defendant became a suspect almost immediately after the
> shooting.   According to the homicide detective assigned to the case, Detective
> Barry Morton, a concerned citizen approached him on the scene and
> provided the name of the perpetrator, Michael Wiggins.   A photographic line-
> up was compiled and presented to Mrs. Dannel at the temporary homicide
> office on the same evening as the murder.   She selected the defendant's

---

[2] State Rec., Vol. 1 of 6, Bill of Indictment, 3/1/2007, Criminal District Court for the Parish
of Orleans.

[3] State Rec., Vol. 1 of 6, Minute Entry, 3/7/07.

[4] State Rec., Vol. 1 of 6, Minute Entry, 8/4/09; State Rec. Vol. 5 of 6, Trial Transcript,
8/4/09, p. 5.

photograph, an identification which she repeated at the motion hearing and trial.[5]

After a one-day bench trial, Wiggins was found guilty as charged.[6]  On October 7, 2009, the trial court denied Wiggins' motion for post-verdict judgment of acquittal, his motion for a new trial, and his motion to reconsider the sentence.[7]  The trial court sentenced Wiggins to life imprisonment at hard labor, and appointed the Louisiana Appellate Project to represent him on appeal.[8]

Wiggins appealed to the Louisiana Fourth Circuit Court of Appeal.  On direct appeal, Wiggins asserted two errors: (1) he received ineffective assistance of counsel at trial because his trial counsel failed to object to statements by Detective Morton that were "testimonial hearsay" and "demonstrably and prejudicially false" and (2) the trial court erred in denying his motion to suppress identification evidence.[9]  On November 7, 2012, the court of appeal affirmed his conviction and sentence.[10]  Wiggins sought review to the Louisiana Supreme Court, which denied relief without stated reasons on May 17, 2013.[11]

---

[5] *State v. Wiggins*, 2011-1566 (La. App. 4 Cir. 11/7/12), 103 So. 3d 746 (Table); State Rec., Vol. 5 of 6, 4th Cir. Opinion, 2011-KA-1566, 11/7/12.

[6] State Rec., Vol. 1 of 6, Minute Entry, 8/4/09; State Rec. Vol. 5 of 6, Trial Transcript, 8/4/09, p. 117.

[7] State Rec., Vol. of 6, Minute Entry, 10/07/2009.

[8] *Id.*

[9] State Rec., Vol. 5 of 6, Appellant's Brief, 2011-KA-1566, 1/6/2012; *State v. Wiggins*, 2011-1566 (La. App. 4 Cir. 11/7/12); State Rec., Vol. 5 of 6, 4th Cir. Opinion, 2011-KA-1566, 11/7/12.

[10] *State v. Wiggins*, 2011-1566 (La. App. 4 Cir. 11/7/12); State Rec., Vol. 5 of 6, 4th Cir. Opinion, 2011-KA-1566, 11/7/12.  The court of appeal did find that the trial court erred in failing to state that the defendant's sentence must be served without the benefit of parole,

On December 20, 2013, Wiggins filed his federal petition for *habeas corpus* relief reasserting the claims raised on direct review—ineffective assistance of counsel and suggestive identification procedure.[12]   The State filed a response conceding that the application is timely and that both of his claims are fully and properly exhausted.[13]   The State argues, however, that he has not met his burden of proof on the ineffective assistance of counsel claim and that he has failed to prove that the identification made of him by Mrs. Dannell warranted suppression, and as a result he cannot demonstrate that the Louisiana Fourth Circuit's denial of his suppression claim violated a clearly established federal law.[14] For the reasons set forth therein, the court agrees that Wiggins' claims lack merit.

## II.   *Standards of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.[15] Subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of

---

pursuant to Louisiana Revised Statute 14:30.1.  But, as the court noted, this fact is "deemed to have been imposed with the restriction, even in the absence of the trial court's failure to delineate the parole restriction."  *Id.*

[11] *State v. Wiggins*, 2012-2653 (La. 5/17/13), 117 So. 3d 511, State Rec., Vol. 5 of 6, La. S. Ct. Order, 2012-K-2653, 5/17/13.

[12] Rec. Doc. No. 1, Petition.

[13] Rec. Doc. No. 9, State's Response, p. 4-5.

[14] *Id.* at 29-30; 37-38.

[15] The AEDPA went into effect on April 24, 1996 and applies to *habeas* petitions filed after that date. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir.1998) (*citing Lindh v. Murphy*, 521 U.S. 320 (1997)); *see also, United States v. Sherrod*, 964 F.2d 1501, 1505 (5th Cir.1992)(Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law).

fact, pure questions of law, and mixed questions of both.  The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

A state court's determination of factual issues is presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

A state court's determination of questions of law and mixed questions of law and fact is given deference under 28 U.S.C. § 2254(d)(1), unless the decision "was contrary to … clearly established Federal law, as determined by the Supreme Court of the United States, or … involved an unreasonable application of … clearly established Federal law, as determined by the Supreme Court of the United States."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  The "contrary to" and "unreasonable application" clauses have distinct meaning:

> A decision is contrary to clearly established Federal law "if the state court
> arrives at a conclusion opposite to that reached by [the Supreme Court] on a

> question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."   Under § 2254(d)(1)'s "unreasonable application" language, a writ may issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

*Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001) *(quoting Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)) (citations omitted).   However, "'[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'"  *Price v. Vincent*, 538 U.S. 634, 641 (2003) (*quoting Woodford v. Visciotti*, 537 U.S. 19, 24–25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. at 699 (2002).   Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."   *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002), *cert. denied sub nom, Neal v. Epps*, 537 U.S. 1104 (2003).

The burden is on the petitioner to show that the state court applied the precedent to the facts of the case in an objectively unreasonable manner.  *Price*, 538 U.S. at 641 (*quoting Woodford*, 537 U.S. at 24–25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *White v. Woodall*, 134 S. Ct. 1697,

1702 (2014) (*quoting Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786–787, 178 L.Ed.2d 624 (2011).

### III.   *Petitioner's Claims*

#### 1.  Ineffective assistance of counsel

Wiggins contends that he received ineffective assistance of trial counsel based on counsel's failure to properly read a preliminary hearing transcript, which he contends resulted in a failure to object at trial to Detective Morton's incorrect testimony regarding the source who initially identified Wiggins as the perpetrator.[16]  Further, he argues that this error was compounded by trial counsel's failed attempt at impeaching Detective Morton.[17]

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.  Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was constitutionally deficient and that the deficient performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 697 (1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir.1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e.* deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  *Strickland*, 466 U.S. at 697.

---

[16] Rec. Doc. 1-2, Memorandum in support, p. 12.
[17] *Id.* at 14-16.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir.2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (*quoting Strickland*, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir.1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

Because the state courts rejected petitioner's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state-court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact doubly deferential:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, –––
–, 129 S.Ct. 1411, 1413–14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

*Harrington v. Richter*, 131 S.Ct. 770, 785–86 (2011) (citation omitted).  The Supreme Court

then explained:

> Surmounting *Strickland's* high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under de novo review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

*Id.* at 788 (citations omitted; emphasis added).

Here, Wiggins contends that at trial Detective Morton contradicted his prior

testimony at the preliminary hearing, and that trial counsel's failure to object to such

testimony amounted to constitutionally deficient performance, without which there is at

least a reasonable probability that the court "would have been reluctant to find Mr. Wiggins

10

guilty beyond a reasonable doubt."[18]   The Fourth Circuit held that trial counsel's actions, which possibly included a "poor job of impeaching" and perhaps even were the result of a "mistake," did not constitute constitutionally deficient counsel.[19]   Thus, the Fourth Circuit did not consider the question of prejudice.  *See Strickland*, 466 U.S. at 697.

The record before this court shows that Detective Morton's testimony at trial did indeed contradict his prior testimony at the preliminary hearing a few years earlier.[20]   In the preliminary hearing, conducted just a few months after the crime, on February 26, 2007, Detective Morton testified that he developed Michael Wiggins as a suspect from a citizen on the scene who identified him by name as the perpetrator.[21]   He further stated that this information was not relayed by the citizen himself as a witness to the crime, but rather that "[i]t was information being conveyed through subjects on the scene."[22]   Thus, during the preliminary hearing, it was established that the "citizen" on the scene was separate from the "witness" – namely, Mrs. Dannel—who later identified Wiggins in the line-up, and that the citizen had not in fact witnessed the incident.

In contrast to this testimony, Detective Morton stated at trial—which occurred over two years after the preliminary hearing, and nearly three years after the crime itself—that

---

[18] Rec. Doc. 1-2, Memorandum in support, p. 28.
[19] *State v. Wiggins*, 2011-1566 (La. App. 4 Cir. 11/7/12); State Rec., Vol. 5 of 6, 4th Cir. Opinion, 2011-KA-1566, 11/7/12.
[20] *Compare* State. Rec., Vol. 5 of 6, Trial Transcript, 8/4/09, p. 37 *with* State Rec., Vol 1 of 6, Preliminary Hearing Transcript, 2/26/07, p. 2-4.
[21] State Rec., Vol 1 of 6, Preliminary Hearing Transcript, 2/26/07, p. 2-4.
[22] *Id.*

he was approached by "one subject in particular" who told him "[t]hat they had seen the incident, and the person responsible was Michael Wiggins."[23]   Rather than lodge an objection to this statement, trial counsel allowed Morton to continue testifying.  Later, on cross-examination, trial counsel attempted to impeach Detective Morton, based upon an allegedly erroneous reading of the preliminary hearing transcript.  Thus, trial counsel first asked Detective Morton to confirm that on direct examination he stated that the first witness gave him the name, which Morton did.   Then, trial counsel presented the preliminary transcript and read from the record:  "The question was, 'Did a witness who allegedly saw the actual thing happen to identify the perpetrator by name?' And your answer was, 'No, they did not,' is that correct?" Detective Morton answered, "Yes" and the cross-examination concluded.[24]   However, what trial counsel did not realize was that the "witness" referred to in the preliminary hearing was Mrs. Dannel, not the unidentified citizen to whom Morton referred to at trial.  Thus, the prosecutor was able to rehabilitate the witness rather cursorily by reading further from the preliminary transcript, and establishing that it was in fact Mrs. Dannel who Detective Morton had referred to as not identifying the suspect by name.

Wiggins contends that the failure to object as well as the botched impeachment attempt amount to constitutionally deficient counsel, and that the Fourth Circuit unreasonably applied the law to deny this claim on the merits. This court disagrees, and

---

[23] State. Rec., Vol. 5 of 6, Trial Transcript, 8/4/09, p. 37.
[24] *Id.* at 57-58.

under the "doubly deferential" standard applicable to *habeas* review herein, this claim must fail, because the Fourth Circuit's denial of Wiggins' claim does not constitute an "unreasonable application" of *Strickland*, nor was it "contrary to" the law.

First, the Fourth Circuit correctly identified the well-established standard of *Strickland* as the applicable framework for analyzing this claim.[25]   After a review of the record, the Fourth Circuit found that the failure to object was a matter of trial strategy—an area where courts must be highly deferential to counsel's judgments.  *Strickland*, 466 U.S. at 690-91.   Petitioner argues that the Fourth Circuit's decision was "contrary to" the law because the court stated that:

> Because it is well-settled law that matters of trial strategy, even unsuccessful ones, cannot form the basis of an ineffective assistance counsel claim, the appellant's complaint regarding counsel's failure to object to Detective Morton's direct testimony does not entitle him to any relief.[26]

This argument hinges on Petitioner's claim that the Fourth Circuit stripped from the inquiry a "reasonableness" factor—*i.e.* that "under *Strickland* a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial"—and instead stated an erroneous rule of law that no strategic choice can form an ineffective assistance counsel claim.[27]   The court here makes two observations.   First, the above-quoted language from the Fourth Circuit

---

[25] *State v. Wiggins*, 2011-1566 (La. App. 4 Cir. 11/7/12); State Rec., Vol. 5 of 6, 4th Cir. Opinion, 2011-KA-1566, 11/7/12.

[26] *Id.*

[27] Rec. Doc. 1-2, Memorandum in support, p. 19 (citing *Massaro v. United States*, 538 U.S. 500, 501 (2003)).

followed a lengthy review of the record, through which it is clear that the Fourth Circuit did in fact inquire into the reasonableness of the trial counsel's decisions.  Apparently finding those decisions reasonable, the court considered them a matter of "strategic choice."  Thus, while the precise language used in the Fourth Circuit's opinion may have inartfully (or even incorrectly) stated exactly the right rule, the court did not ultimately "unreasonably apply" the *Strickland* standard, which it had previously and correctly identified in its opinion. Furthermore, the Fourth Circuit's substantial review of trial counsel's actions inherently demonstrates its inquiry into the reasonableness of the effectiveness of counsel.

Second, the case law quoted by Petitioner is unavailing.  Three of the cases relied on in his brief, including *Strickland*, merely state that reasonableness is included in the inquiry for strategic choices—none of them conclude that in an instance similar to this case the trial strategy was unreasonable.[28]  In fact, because it appears that the Fourth Circuit did inquire into the reasonableness of trial counsel's actions, as a matter of properly applying *Strickland*, one should not read that court's opinion to create an internal inconsistency.  *See Holland v. Jackson*, 542 U.S. 649, 654 (2004) (finding that Sixth Circuit erred in holding that state court acted contrary to federal law by requiring proof of prejudice by a preponderance of the evidence rather than by a reasonable probability where state court

---

[28]  A fourth case, from the Eleventh Circuit, espouses the rule that "the mere incantation of strategy does not insulate attorney behavior from review."  *Care v. Singletary*, 971 F. 2d 1513, 1518 (11th Cir. 1992).  However, that statement relies entirely on Eleventh Circuit precedent establishing that whether a "tactic" is reasonable is a question of law to which the Eleventh Circuit need give no deference to the state or district court.  *Id.*

began by reciting correct *Strickland* standard and later mentioned a preponderance standard); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (section 2254 demands that state-court decisions be given the benefit of the doubt and "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law.").

As stated in *Strickland*, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. It is clear that the Fourth Circuit neither applied a law contrary to *Strickland*, nor applied it in an objectively unreasonable manner.

In fact, in its review of the record, the Fourth Circuit acknowledged the confusion that the preliminary transcript might cause—because during that hearing Detective Morton referred to both a "citizen" and a "witness" and often used "they" when referring to either one, to avoid identifying either party by gender. While a closer reading of both the preliminary hearing and the trial testimony shows that all references in the former to the "witness" referred to Mrs. Dannel, it was not unreasonable for the Fourth Circuit to conclude that in the "heat of the trial," counsel's failure to object, even if based on a misreading, did not reach the level of deficiency contemplated by *Strickland*.

Furthermore, the Fourth Circuit's determination that trial counsel's unsuccessful impeachment attempt did not fall below professional prevailing norms to constitute ineffective assistance of counsel must also be upheld. The Fourth Circuit found that while

trial counsel's error allowed the prosecutor to explain the apparent contradiction, there remained in the case "a strong inference that the detective's testimony differed at trial from that given previously."[29]   In other words, despite having introduced prior testimony regarding the wrong person, defense counsel still was able to elicit that in the preliminary hearing, Detective Morton stated that the witness who allegedly saw the actual thing happen did not identify the perpetrator by name.   Thus, the Fourth Circuit aptly noted that despite trial counsel's error, evidence of Detective Morton's inconsistent testimony did make it before the trial court.[30]   This court therefore finds that the Fourth Circuit's decision that trial counsel's actions were not constitutionally deficient was neither contrary to nor an unreasonable application of the relevant federal law as established by *Strickland*.

> **2.  Suggestive Identification Procedure**

Wiggins argues in his second claim for relief that the procedure employed by Detective Morton through which Mrs. Dannel identified him as the perpetrator was so unduly suggestive that it gave rise to a substantial likelihood of misidentification in violation of his constitutional rights.[31]   Specifically, Wiggins' argument rests on four factors which he argues make the photo lineup procedure presented to Mrs. Dannel unfairly suggestive:

---

[29] *State v. Wiggins*, 2011-1566 (La. App. 4 Cir. 11/7/12); State Rec., Vol. 5 of 6, 4th Cir. Opinion, 2011-KA-1566, 11/7/12.
[30] *Id.*
[31] Rec. Doc. 1-2, Memorandum in Support, p. 28.

> (1) Detective Morton told Mrs. Dannel that the suspect's photo was in the lineup; (2) he administered the identification procedure while knowing which photo depicted the suspect; (3) the photo of Mr. Wiggins was plainly different and stood out from the rest; and (4) Detective Morton constantly downplayed Mrs. Dannel's reasons for hesitating to pick the photo of Mr. Wiggins, thus clearly signaling to her which was the "correct" photo to choose.[32]

Wiggins therefore contends that the trial court erred in denying his motion to suppress the identification, and the Fourth Circuit unreasonably applied the law in its affirmance.

The admissibility of an eyewitness's identification is a mixed question of law and fact. *Coleman v. Quarterman*, 456 F.3d 357, 544 (5th Cir. 2006) (citing *Livingston v. Johnson*, 207 F.3d 297, 309 (5th Cir. 1997)); *see also Sumner v. Mata*, 455 U.S. 591, 597 (1982) ("[T]he ultimate question as to the constitutionality of the pretrial identification procedures … is a mixed question of law and fact ….").

In *Simmons v. United States*, 390 U.S. 377 (1968), the United States Supreme Court established a two-prong test for the exclusion of identifications based on impermissibly suggestive identification procedures that deny due process.  The first prong requires determination of whether the identification procedure was impermissibly suggestive.  If not, no further inquiry is necessary.  If it is, a separate inquiry must be made as to whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.

In *Manson v. Brathwaite*, 432 U.S. 98, 114-16 (1977), the United States Supreme Court reaffirmed several factors enumerated in *Neil v. Biggers*, 409 U.S. 188, 199 (1972),

---

[32] *Id.*

that should be considered when reviewing the reliability of a witness's identification of a defendant.  These factors include (1) opportunity of the witness to view the subject, (2) witness's degree of attention, (3) accuracy of the description, (4) the witness's level of certainty, (5) the elapsed time between the crime and the identification and (6) the corrupting influence of the suggestive identification itself.

The record shows that evidence relevant to the identification was considered at a motion hearing on the suppression issue on May 4, 2007.[33]   At this hearing both Mrs. Dannel and Detective Morton testified to the events that occurred the night of the murder, and the subsequent lineup that Mrs. Dannel was shown.[34]  The testimony shows that many of the *Manson* factors were considered by the trial court.  First, Mrs. Dannel testified that she was able to view the murder from inside of the truck, where she was "on one side of the street, and that person's on the opposite side of the street."[35]   Furthermore, she stated, "I was able to see three individuals.  I was able to see the person that shot my husband.  I was able to see clear enough everybody that was in eyesight of me, because there was a streetlight at the corner."[36]   During the testimony, the audiotape of the lineup procedure was introduced by defense counsel.  The audiotape established, along with Mrs. Dannel's testimony, that despite having some reservations regarding her identification of Wiggins,

---

[33] State Rec., Vol. 1 of 6, Transcript of Motion Hearing, 5/4/07.
[34] *Id.*
[35] *Id.* at 8.
[36] *Id.*

she initially claimed she was 90% sure it was him.[37]   Soon thereafter, after a 15-minute

break, which she expressed she took because she felt ill, she returned to continue and

expressed with 100% certainty that her identification was correct.[38]  Both the tape and the

testimony establish that the identification took place approximately two hours after she

had witnessed the murder.[39]

The record, however, also establishes that Detective Morton did make certain

suggestive remarks during the lineup procedure.  First, he told Mrs. Dannel that a person

that the police believed was a suspect was in the line-up.[40]  Second, once Mrs. Dannel had

eliminated four of the photographs, and was primarily focused on Number 5 (of Wiggins),

he made further suggestive statements.  When Mrs. Dannel expressed concerns about hair

style and skin tone, Detective Morton stated that because it was a booking photo, not taken

that evening, the suspect could look darker or heavier than he might have that night.[41]  The

record also shows that Mrs. Dannel acknowledged that photo Number 5 was the largest

photo.[42]

---

[37] *Id.* at 24; 44.

[38] *Id.* at 27.

[39]  *Id.* at 6 (describing that murder took place between 9:30 and 10:00); *id.* at 36 (audiotaped conversation with Detective Morton showing Mrs. Dannel photographic lineup began at approximately 12:15).

[40] *Id.* at 38.

[41] *Id.* at 25; 44.

[42] *Id.* at 28.  It is clear from the photographic lineup that "largest" refers to the size of the suspects' faces in the lineup, rather than the size of the photograph itself.

The record thus shows that there was evidence to be considered by the court on both sides of the reliability question when weighing the *Manson* factors. It is also clear that the trial court gave special consideration to the argument that Detective Morton's suggestive remarks after Mrs. Dannel's focus on Wiggins may have influenced the reliability of her identification.[43] The trial court took the motion under consideration and invited memoranda from counsel on both sides to address the issue.[44] On June 19, 2007, the trial court denied the motion to suppress the identification, acknowledging defendant's arguments, but stating that the judge thought that "the wife knew exactly who she was identifying in this matter."[45]

The Fourth Circuit, in affirming the trial court, first reviewed the law of suggestive identification procedure. It then discussed how the trial court had carefully considered the credibility of Mrs. Dannel's testimony and found that it had outweighed the potentially suggestive remarks by Detective Morton. Furthermore, as the Fourth Circuit aptly pointed out, Wiggins' attacks on the identification rely on studies regarding eyewitness identification *in general*, rather than on facts within the record in this case. In contrast, Mrs. Dannel's own testimony adamantly supports the identification, both at the motion hearing and at trial.[46] The court was the trier of fact both at the motion hearing and at trial, which reinforces that the identification's potentially suggestive nature was not lost on the

---

[43] *Id.* at 70-80.
[44] *Id.*
[45] State Rec., Vol. 1 of 6, Transcript of the Ruling on Motion Hearing, p. 2.
[46] *Id.*; State Rec., Vol. 5 of 6, Trial Transcript.

court—though at both stages the court found Mrs. Dannel's credibility to outweigh any misgivings about its reliability.

Thus, in its detailed opinion affirming the conviction, the Fourth Circuit reached the conclusion that the trial court had not abused its discretion in holding the identification admissible at trial.  In doing so, while the Fourth Circuit did not explicitly apply the *Manson* factors in any one section of its opinion, it did consider these relevant factors throughout— such as the opportunity for Mrs. Dannel to view the witness, the time elapsed, her degree of certainty, and the corrupting influence of Detective Morton's remarks—which it deemed supported the trial court's decision.  Furthermore, the Fourth Circuit clearly set forth the correct legal standard under *Manson*.  Thus, the Fourth Circuit's decision was not contrary to or an unreasonable application of Supreme Court precedent.  Wiggins is not entitled to federal *habeas corpus* relief on this claim.

## **RECOMMENDATION**

For the foregoing reasons, **IT IS RECOMMENDED** that Petitioner's federal *habeas corpus* application asserting his ineffective assistance of counsel claim and his suggestive identification procedure claim be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (*en banc*).[47]

New Orleans, Louisiana, this 23rd  day of ___October___, 2014.

**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[47] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.